## THE GREENWICH.

### SEABOARD EQUIPMENT CORPORATION v. RED STAR TOWING & TRANSPORTATION CO. et al.

(Circuit Court of Appeals, Second Circuit. November 10, 1919.)

No. 23.

1. **Towage ☞12(1)—Sinking of scow due to unseaworthiness.**

  The sinking of a dump scow, when dumped after being towed to the dumping grounds in calm weather, *held* caused by her leaking from the strain of dumping, due to unseaworthiness, and not from fault or negligence of the tug.

2. **Shipping ☞54—Charterer not liable for loss through unseaworthiness.**

  The charterer of a scow *held* not liable for her loss, due to unseaworthiness.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty by the Seaboard Equipment Corporation against the steam tug Greenwich, the Red Star Towing & Transportation Company, claimant, and the Builders' Brick & Supply Company. Decree for respondents, and libelant appeals. Affirmed.

A. J. Lindsay, of New York City (Richmond J. Reese, of New York City, of counsel), for libelant.

Burlingham, Veeder, Masten & Fearey, of New York City (Chauncey I. Clark and Charles E. Wythe, both of New York City, of counsel), for claimant.

Hyland & Zabriskie, of New York City (Nelson Zabriskie, of New York City, of counsel), for respondent.

Before WARD, ROGERS, and MANTON, Circuit Judges.

MANTON, Circuit Judge. [1] The libelant was the owner of the scow S. Y. No. 7. While in tow of the tug Greenwich, off Eaton's Neck, Long Island Sound, on June 23, 1915, bound for the dumping grounds, off the Neck, a distance of about 22 miles, she was damaged, thus giving rise to this claim. This dumper scow had four pockets having a capacity of 350 yards. She was loaded on June 22, 1915, at West Farms Creek, with mud and brick, dug from its bottom. She was picked up at Stakeboat No. 2 off College Point, Long Island Sound, by the Greenwich. She had no power, and there was no caretaker aboard. She was placed in the tow with another boat, the Blue Hummer, in tandem; No. 7 towing ahead. The weather was clear. She had a list of 1½ feet to starboard and a freeboard of about one foot on her starboard side. The Blue Hummer was dropped at Captain's Island, and the Greenwich, with the "No. 7," continued on to the dumping grounds, 4 or 5 miles further. The weather continued clear, and she reached the dumping grounds about 11 o'clock. A deckhand on the tug was sent back to dump her. He was paid for dumping the scow by the respondent. She listed to starboard, and when the pockets were dumped, she rose out of the

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

water 4 or 5 feet and immediately began to settle. An examination revealed that she had about 3 feet of water in her, and, although an effort was made to beach her, she sank after proceeding about 500 yards.

The scow was chartered by the libelant, the terms of which are contained in a letter of June 2, 1915, to the Builders' Brick & Supply Company, for $6 per day, without a scowman. An employee of the respondent agreed with the captain of the tug that a man from the tug would dump the scow.

The defense to the libel is that the scow was unseaworthy. Engineer Brush, of the respondent, testified as follows:

"Q. Now, the first load was placed where, or unloaded where? A. We unloaded above on the bank over across on the land over there.

"Q. Was the scow moved on that occasion? A. Only that I moved over there with the lines.

"Q. Was the scow moved, or the dredge, or both? A. The dredge and scow, both; I moved them.

"Q. When you started to put on the second load? A. Well, I did put on a second load after I patched the lining of the scow. She was leaking around the seams, and I got canvas and a plank and patched some of the seams, and loaded her again, and she looked all right.

"Q. Had she been leaking through the lining? A. Through the inside lining; the lining on the inside of the boat was, seemed to me, very weak; and the stuff that we had to put in there. was brick, and it didn't make a very good—it is kind of filter, and the water ran through; it is not like solid mud.

"Q. The pressure of the boat in the pockets has some effect on the lining of the boat? A. Yes, sir.

"Q. And that was where the boat was leaking? A. Yes, sir.

"Q. And that was where there was broken plank? A. Yes, sir; broken plank.

"Q. And that you patched? A. Yes, sir.

"Q. By putting the canvas and a piece of board over it? A. Yes, sir."

The same witness later in his testimony, on cross-examination, stated that:

"It was quite a bit leaky. With the heft of the load on the inside, the seams opened up; and, of course, when you took the load off, she would go back, spring back again; but it was weak; if not, it probably wouldn't open up; and I had to move the load on the inside, and by putting on canvas and a heavy plank, made a good job of it."

This was after the scow was loaded for the first time. He further testified:

"Q. How far did she have to be moved from where you loaded her the first time, on the first occasion, to the place where she was dumped upon some land? A. Oh, a thousand feet, probably.

"Q. And then how long, about, did it take you to unload her? A. We didn't take long. I took a few buckets full out of the top, and knocked the box off, and she jumped out of the water. Just how long, I don't know. I didn't time her.

"Q. You didn't dump her by putting the dredge or bucket in and digging the dirt out? A. No, sir.

"Q. But by opening the boards and letting her dump right through? A. Yes; let the mud fly out.

"Q. What did you observe about her at that time with regard to leaks, if anything? A. That is when I fixed those two leaks, in the planking. There were two places where they were leaking quite a bit. You could look down

through in the inside as she was loaded, and the seams had opened up, and I put canvas and planks, and loaded her again; and there was nothing out of the ordinary, out of the way with her, that I could see.

"Q. Was there anything, any indication, to show what caused these particular leaks? A. Weakness in the planks; that is all.

"Q. Any signs of anything else? A. She looked like a weak old thing, if you looked her over."

It was necessary to siphon her out after he unloaded her the first time, and before he made the repairs. He stated that she leaked like "an old sieve." After the repairs, he stated that there were small leaks through seams, but not what he called dangerously bad leaks. The difficulty was that there was some strain upon her, such as usually follows when dumping takes place. This permitted the mud and brick to slide out through her bottom. The canvas and board gave way, and the water poured in the open seams and the broken plank, causing her to fill with water and sink. The deckhand, who went aboard and dumped her, says that she commenced to settle down slowly right after he dumped the last pocket. There is no other cause apparent for her sinking.

The conclusion of the District Judge was the only reasonable one to draw from the evidence. The evidence indicates that there was no time to siphon her out, or to save her, for she sank shortly after she was dumped. The burden was upon the libelant to prove fault on the part of the tug. This it has not done. The claim of negligence has failed of proof. The tug was not an insurer, and so the mere sinking while in her custody does not establish the case. The Winnie, 149 Fed. 725, 79 C. C. A. 431; Aldrich v. Penn. R. R. Co., 255 Fed. 330, 166 C. C. A. 500.

The evidence here stands uncontradicted that the tow was made up in the usual way. There was plenty of water in which to navigate; the scow met with no mishap by collision or improper navigation. It was only when she was dumped that damage occurred. It was undoubtedly due to the scow's inability to withstand the jar and jolt of the strain of dumping. She was leaking before, and leaked worse afterward; all of which demonstrates conclusively that she was unseaworthy. The Loyal, 204 Fed. 930, 123 C. C. A. 252; The Willie (D. C.) 134 Fed. 759.

[2] Nor can liability be imposed upon the charterer. The obligation of the charterer was that of a bailee. In Mulvaney v. King Paint Mfg. Co. 256 Fed. 621, 167 C. C. A. 642, this court said:

"Where, by contract of bailment, the hirer has either expressly or by fair implication assumed the absolute obligation to return, even although the thing hired has been lost or destroyed without his fault, the contract embracing such liability is controlling, and must be enforced according to its terms. A bailee who assumes by the common-law liability is exempt from liability for loss of the consigned goods arising from inevitable accident. But the bailee may, however, enlarge his responsibility by contract, express or fairly implied, and render himself liable for the loss by destruction of the goods committed to his care. The bailment or compensation to be received therefor being a sufficient consideration for such an undertaking. * * *

"It would therefore appear that the charterers here are liable only to the extent of the stipulations of the contract, and in construing the contract, since the terms merely declare the liability which the common law would impose,

the liability of the bailee is neither increased nor changed, and the charterer undertook merely to return the barge after six months in the same condition as received, with the usual wear and tear. There is no obligation to do more."

The provision of the contract to return the scow in as good condition as when received, wear and tear excepted, was waived by counsel for the libelant at the commencement of the trial. The obligation of the charterer was that of bailee, and as we have found that the scow was unseaworthy, which resulted in loss, we cannot sustain the libel as against the respondent appellee.

The decree is affirmed.