## THE CLEVELAND.

## THE DELMAR.

### Petition of PENNSYLVANIA R. CO. et al.

District Court, S. D. New York.

April 7, 1941.

Burlingham, Veeder, Clark & Hupper, of New York City (Chauncey I. Clark and Adrian J. O'Kane, both of New York City, of counsel), for petitioners.

Bigham, Englar, Jones & Houston, of New York City (Andrew J. McElhinney, of New York City, of counsel), for claimants.

Macklin, Brown, Lenahan & Speer, of New York City (Leo F. Hanan, of New York City, of counsel), for M. & J. Tracy, Inc., and other claimants.

Foley & Martin, of New York City (John R. Stewart, of New York City, of counsel), for Cleary Bros. et al.

GODDARD, District Judge.

Petitioners seek limitation of and exoneration from liability for the loss of several barges and their cargoes which were in a hawser tow of the Pennsylvania Rail-

road Company in the hurricane of September 21, 1938.

At 12:01 A.M.* September 21, 1938, the Pennsylvania Railroad Company's tug Cleveland left South Amboy, New Jersey, with a tow of fourteen loaded coal boats bound for the Pennsylvania Railroad stakeboat which is located a little below and to the eastward of Ellis Island in upper New York Bay. The tow was made up in five tiers. Three boats abreast in the first four tiers, and two boats in the fifth tier trailing astern of the middle and starboard boats in the fourth tier. Three hundred foot hawsers from the Cleveland's stern were run to the outside boats and the head tier. The Cleveland is a twin screw steamtug of 201 tons, 99 feet long, 24 feet beam, with 700 Horse Power. During the first hour there was a light wind averaging about four miles an hour. At 3:45 A.M. the tow arrived off Cartaret, New Jersey, and was joined by the tug Delmar owned by the New York, Philadelphia and Norfolk Railroad Company and then under charter to the Pennsylvania Railroad Company. The Delmar is a twin screw steamtug 122 feet long, of 294 tons gross with 873 Horse Power. One of the boats was left at Shooters Island by the Delmar which returned and took a position at the port side of the tow. The tow, after leaving the Kills, and rounding Robins Reef at about 7 A.M., headed up the Bay toward the stakeboat. At this time the weather was overcast and rainy; wind between 14 and 17 miles an hour from the north. The tide was beginning to ebb. The tow arrived near the stakeboat about 8:15 A.M. and the Delmar proceeded to shift the barges already lying at the stakeboat to allow the Cleveland to make her tow fast at the stakeboat. As the Cleveland was manoeuvering to shorten the hawsers preparatory to landing, her deck hand, who was handling the port hawser, slipped and lost control of it and the hawser became fouled in the tug's propellers completely disabling the tug. This occurred about 8:30 A.M. With the disabling of the Cleveland, the Delmar put out two six inch hawsers to the tow and the Cleveland was made fast on the Delmar's port side. About 8:45 A.M. the Charles Kennedy, Jr., passing up the Bay, was hailed and requested to notify the Pennsylvania Railroad dispatcher at Pier H, Jersey City, that the Cleveland had a hawser fouled in her wheel. The time when the Kennedy reached Pier H and reported is disputed, but I estimate it to have been shortly before nine-thirty. Thereupon, the Jersey City was ordered to the Cleveland's assistance leaving Pier H at 9:30 A.M. with a lighter which she left at Pier D on her way to the stakeboat. At 10:20 A.M. she left the stakeboat with the Cleveland in tow and took her over to Crane's Drydock arriving there at 10:45 where arrangements had been made to have the Cleveland hauled out and the hawser removed from her propellers.

Around 9 A.M., some fifteen or twenty minutes after the Kennedy left the tow, when the tow had drifted down with the tide about half a mile and was near Black Tom Channel, the Pennsylvania tug Canton was observed coming down the Bay with a barge in tow alongside, and upon request took the Cleveland over to the stakeboat and tied her up. The Canton then returned to the tow about 10:10 and asked the Captain of the Delmar if he needed assistance. The Captain of the Delmar replied that he was all right but asked the Captain of the Canton to continue on to Greenville with her tow and when he got there to telephone to the Pennsylvania Railroad dispatcher at Pier H, Jersey City, and ask him to send a tug to assist the Delmar. The Canton proceeded on to Greenville and at 10:30 A.M. telephoned the message to the Pennsylvania dispatcher. The Captain of the Delmar had decided "to pull out the tide" in the meanwhile, which consists of keeping the tug's engines going full ahead so as to off-set the tide as much as possible and to maintain steerage way, but drifting backwards slowly until the tide turned, when he would proceed ahead to the stakeboat. This, the Captain of the Delmar, with eighteen years experience at sea—twelve years of it as master of tugs—testified was a usual and customary practice which he had followed many times. In doing that on this occasion he said he was using his best judgment, not expecting that a hurricane would strike New York harbor that afternoon, and that the Delmar had ample power to handle the tow under normal conditions.

Upon receiving the message from the Captain of the Delmar, the Canton was ordered to return and assist the Delmar and her tow, which she did, leaving Greenville at 10:35 A.M., joining the Delmar at

---

* The times referred to are Eastern Standard Time, unless otherwise stated.

11 A.M. off Pier 8, Staten Island, where the tow had drifted.

Pursuant to telephone orders which the Captain of the Jersey City received while at Crane's Drydock, he left there at 11:35 and proceeded down the Bay to the Delmar which she reached at 12:05 between the Quarantine and the Narrows, where the tow had drifted under the increasing wind and tide. Ten minutes (11:55 A.M.) before the Jersey City reached the tow, a telephone message had been received by the Boatmaster for the Pennsylvania Railroad, Captain Hill, from the Captain of the tug Turecamo Boys then at Pier 5, American Docks, Staten Island, that the Delmar and her tow were drifting down toward the Narrows. The Turecamo Boys was ordered to go to the assistance of the tow which she did, joining it at 12:20. Captain Hill also immediately telephoned the Moran Towing and Transportation Company requesting additional tug boats for the Delmar's tow, and the E. F. Moran, Jr. and the Eugene F. Moran were immediately sent to the tow, reaching it about 1 P.M. When the Jersey City reached the tow, the tug Canton was dispatched to a Coast Guard boat in the vicinity requesting the Coast Guard to telephone to the Pennsylvania Railroad Company to send more assistance. In reply to this message, the Coast Guard was informed that tugs were on the way to the tow. At 12:30 P.M. Captain Hill (Boatmaster for the Pennsylvania Railroad Company) ordered the tug Williamsport, then at Pier H, with Captain Wilson, Assistant Boatmaster, to proceed to the Delmar's tow. The Williamsport arrived at the tow at 1:30 P.M. and Captain Wilson, after surveying the situation, had the barge captains and their wives taken off the coal barges. At 1 P.M. and 1:05 P.M. respectively, the Isabel McAllister and the M. Moran were found to be available and were dispatched to the assistance of the tow which had been located about half a mile below Fort Wadsworth, both reaching it around 2 P.M. As soon as the hawser had been removed from the Cleveland's wheels, she was sent to the aid of the tow and joined it at 2:10 P.M. During this time the wind had increased reaching a velocity at 1:31 of fifty one miles from the north and the tide changed to flood. This wind against the tide produced unusually heavy seas and caused the barges to roll, take in large quantities of water, and to pound against one another. At 1:55 the lines from the Cape West (middle barge in second tier) parted and this put an added strain on the Emmett McLaughlin (starboard barge in second tier) whose starboard forward cleat gave way soon after, causing them to go adrift. Some twenty minutes later, the W. C. Moore broke loose with the result that the ten barges in the four last tiers were broken adrift from the first tier. Between two and three o'clock the wind averaged sixty miles from Northwest and the seas grew worse. Of these ten barges the W. C. Moore was landed at Pier 20, Clifton, by the tug Williamsport; the J. F. Drum, the Mary H., and the Gay Head were landed at Stapleton; the J. F. Drum by the tug E. F. Moran, Jr., the Mary H. by the tug M. Moran, and the Gay Head by the tug Isabel McAllister. The Westfield was picked up by the tug Cleveland and landed at Pier 6, Staten Island. The Zero went ashore in Gravesend Bay. The Cape West, the Emmett McLaughlin, the Hugo Eckner and the Rosetta McLaughlin all sank before they could be gotten to safety. The tugs which had hawsers to the first tier, consisting of the barges Cape Daniel, Ideal and William McAllister, attempted to land them at Stapleton but on the way to William McAllister sank, but the other two were safely landed.

From 2:10 P.M. on until the second tier broke away from the first, there were ten tugs working on the tow—four with hawsers to the head tier, Delmar, Eugene F. Moran, 700 H.P., E. F. Moran, Jr. 700 H.P. and Turecamo Boys, 600 H.P., and three tugs on the starboard side—the Jersey City 665 H.P., M. Moran, 700 H.P., Cleveland; and three tugs on the port side—Canton, 665 H.P., Isabel McAllister 900 H.P., Williamsport, 665 H.P., but they were able to make but little headway against the wind and seas.

Liability is charged by the claimants in rem against the tugs Cleveland and Delmar and in personam against the owners of those tugs and the petitioners. The charges of fault against the Cleveland are—

1) She was negligent in allowing her hawser to become fouled in her propellers;

2) She was negligent, while still in charge of the tow, in refusing to accept the services of the tugs Kennedy and Canton immediately upon their arrival when the tow was close to the stakeboat.

The Delmar is charged with fault in the following respects:

1) For not having the Canton made fast to the Delmar or to her tow after she had returned from placing the Cleveland at the stakeboat;

2) For not attempting to tie her tow up at the stakeboat of the Metropolitan Sand & Gravel Co. or the O'Brien Bros. stakeboat;

3) For making no effort to secure assistance from passing tugs as the tow drifted down the Bay;

4) For not pulling her tow in to the piers along the Staten Island shore.

Liability in personam against petitioners is charged "on the ground that although they received notice of what had occurred to the tow within approximately three-quarters of an hour after its occurrence, no effort was made to send assistance to the tow, in spite of unfavorable weather conditions existing, until after noon time when it was too late".

Petitioners' claim for limitation of and exoneration from liability is made upon the ground that the proximate cause of the losses sustained by the claimants was the unprecedented hurricane of September 21st, 1938, of which neither petitioners nor the tug masters had advance warning; that both the Cleveland and the Delmar were properly equipped for the work; that the tow was handled in the usual manner and reasonable judgment was used by the tug masters; that prompt assistance was dispatched to the tow as soon as petitioners were aware of the need for it; that petitioners are free from privity or knowledge within the meaning of the limitation statute; that the fouling of the Cleveland's propellers was not negligence; and moreover was too remote to have any bearing on the damage to the tow in the hurricane several hours later; that petitioners were not insurers and were liable for negligence only; that the damages sustained by claimants were the result of inevitable accident or "vis major".

■ Petitioners are liable for negligence only. They were not insurers of the safety of the tow, and the burden is upon the claimants to prove negligence. The Greenwich, 2 Cir., 270 F. 42. A contract for towage requires that one who undertakes it shall exercise such reasonable care and maritime skill as prudent navigators usually employ for the performance of similar services. Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699; Aldrich v. Pennsylvania Railroad, 2 Cir., 255 F. 330.

The principal question to be decided is—whether or not the petitioners exercised reasonable foresight and care for the protection of the boats entrusted to their charge, more particularly—did they fail to reasonably anticipate that the hurricane would strike New York harbor that afternoon seriously endangering the safety of the tow and fail to send it timely assistance.

■ It is well to first consider and dispose of the matter of the fouling of the hawser in the Cleveland's propeller, as it happened first. It occurred about 8:30 A.M. after the tow had arrived at the stakeboat. The Cleveland was dropping back for the purpose of shortening her hawsers preparatory to landing her tow to the stakeboat. The Cleveland was doing what was usual and in the customary manner. Two deckhands were aft hauling in the hawsers; Dugan, the deckhand handling the port hawser, slipped on the deck which had become wet from the rain and water dripping from the hawsers. As he slipped he lost his hold on the hawser which went overboard and it became tangled in the Cleveland's propellers. Dugan was not a novice; he had been a deckhand nineteen years and after hearing him describe just what happened, I think that neither he nor the tug master could fairly be charged with negligence. No negligence is attributable to any one because the deck was wet. The Anchoria, 2 Cir., 83 F. 847. Moreover, the fouling of the Cleveland's propeller was so remote that it had no legal connection with the damage to the tow in the hurricane a number of hours later.

"Where, in the sequence of events between the original default and the final mischief an entirely independent and unrelated cause intervenes, and is of itself sufficient to stand as the cause of the mischief, the second cause is ordinarily regarded as the proximate cause and the other as the remote cause." Atchison, Topeka & Santa Fe Railway Co. v. Calhoun, 213 U.S. 1, 7, 29 S.Ct. 321, 323, 53 L.Ed. 671.

■ When the tow left South Amboy there was a light N.E. wind of four miles an hour, and up to the time it left the Kills and entered New York Bay at 7 A.M. the wind ranged between four and eighteen

miles an hour from the North; when it entered the Bay the weather was overcast with rain, wind N between fourteen and seventeen miles an hour. From 8 to 10 A.M. (the fouling of the Cleveland's propeller occurred about 8:30) the wind N ranged from fourteen to twenty two miles an hour, with a maximum velocity of 27 miles at 9:54; from 10 to 12 o'clock twenty eight to thirty miles, with a maximum velocity of 38 miles at 11:33. The wind continued to rise and between 1 and 2 P.M. averaged 46 miles an hour N with an extreme velocity of 51 miles at 1:31 P.M. At two o'clock it shifted to N.W.; between two and three o'clock when the tow broke up, the wind averaged 60 miles an hour from N.W. and later reached a velocity of 70 miles an hour.

The testimony of practically all witnesses is that this hurricane was the worst storm they had ever seen in this vicinity. The northerly wind against the tide after it turned to flood created tremendous waves and unusually high and dangerous seas.

During the three days before it struck New York the United States Weather Bureau had issued reports that there was a hurricane in the vicinity of Florida proceeding up the coast, but that it was not expected to reach New York but to pass off Cape Hatteras and out to sea. On 9:30 P.M. September 20th, it reported "the hurricane was centered about 400 miles east of Jacksonville". On September 21st at 4:25 A.M. the following report was received by the United States Weather Bureau at the Whitehall Station, New York City:

"Hurricane central one A.M. E.S.T. about 225 miles south of Cape Hatteras moving rapidly north or possibly slightly east of north. Indications are that center will pass near but slightly off Cape Hatteras within the next 12 hours attended by dangerous gales and high tides on the coast and hurricane winds short distance offshore. Storm warnings are displayed north of Wilmington, N. C. to Atlantic City, N. J. Caution advised ships in path of this severe storm."

This report was not distributed locally, but at 7 A.M. a N.E. storm warning was hoisted. At 10:40 A.M. the Whitehall Station received the following storm warning:

"Hoist northeast storm warnings nine A.M. north of Atlantic City and South of Block Island, R. I. and hoist southeast storm warnings Block Island to Eastport, Maine. Tropical storm apparently central about 75 miles east of Cape Hatteras moving rapidly north-northeastward attended by shifting gales over a wide area and by winds of hurricane force near center. Northeast or north gales backing to northwest south of Block Island to Hatteras today and southeast or east gales Block Island to Eastport becoming northwest tonight or Thursday morning. Small craft should remain in port until storm passes".

After receiving this warning, the Whitehall Station telephoned at 11 o'clock to the Pennsylvania Railroad offices and a stenographer took down the following which, when typewritten, was placed on the desk of Captain Hill, the Pennsylvania Boatmaster:

"Pier H, Sept. 21, 1938
"Telephone Message:
    "Received 11:00 am (EST) from Weather Bureau:
"Hoist N–E storm warning 9:00 north of Atlantic City to south of Block Island.
"Tropical storm, about 75 miles east of Cape Hatteras, moving rapidly north-northeastward and attended by shifting gales over wide area and by wind of hurricane force near center.
"Small craft should remain in port until after storm passes.
                                "C.J.S."

At 12:02 P.M. another warning was received at the Weather Bureau in New York; this was also telephoned to the Pennsylvania Railroad offices, taken down, typewritten, and placed upon Captain Hill's desk, and was as follows:

"Telephone Message received 1.00 pm EST, from US Weather Bureau:
    "Change gale warning along Atlantic Coast north of Virginia Cape to Sandy Hook, N.J.
    "Tropical storm centered at 10.00 am, 100 miles east of Virginia Cape, moving rapidly north or slightly east of north.
                                "C.J.S."

The weather forecast published in the New York Times of September 21st, was "Near-by Coastal Waters—Fresh north or northeast winds, increasing this afternoon or tonight and overcast with rain.
"Eastport to Sandy Hook—Fresh southerly winds except fresh north or northeast near Sandy Hook, increasing this afternoon or tonight and overcast with rain."

Mr. Kimball, head of the Weather Bureau in New York, said that between midnight and four A.M. on the 21st, there was a fall of .04 of an inch and between four and seven A.M. of .07 of an inch; that observing this, the fluctuating of the wind, and the increased rain fall, he caused the N.E. storm warning to be raised at 7 A.M. The records of the Bureau show that the barometer continued to fall slowly until ten A.M., when a steady and rapid fall occurred until 2:43 P.M. when it reached 28.72 inches—a fall of something over an inch since midnight. From midnight on the 20th to 10 A.M. on the 21st the wind ranged from four to twenty-two miles an hour N and N.E. with a maximum velocity of 27 miles at 9:54 and heavy rain at intervals. Such a storm was not unusual and the tow should have and did weather it without damage or danger. It was the hurricane which struck New York harbor in the afternoon which caused the damage.

Claimants do not deny that it was the hurricane which caused the damage; but contend that respondents should have known from the then conditions and weather reports some five hours before it reached here that it was headed for New York (This would mean between 9 and 10 A.M. on September 21st), and should have gotten the tow to a place of safety before it arrived. But it does not seem to me that respondents could reasonably be charged with warning that the hurricane was likely to strike New York harbor that afternoon previous to respondents' receiving the telephone warning from the Whitehall Weather Station at 11 A.M. pursuant to the report the Station had received at 10:40. The last weather report issued by the Weather Bureau in New York before the one received by the Pennsylvania Railroad Company at 11 A.M. on September 21st was issued at 9:30 P.M. September 20th and reported a hurricane off the Florida Coast which was expected to follow the usual course and to pass off Cape Hatteras and out to sea. However, in compliance with the request from the Captain of the Delmar at 10:30 that he needed the assistance of another tug to take the place of the disabled Cleveland, the Canton was at once sent reaching the tow at 11 A.M. At 11:35 the tug Jersey City at Crane's Drydock was ordered to join the tow which she did at 12:05. Upon receiving the message from the Captain of the tug, Turecamo Boys, at 11:55, that tug was immediately ordered to go to the assistance of the tow.

At noon two more tugs, the Elizabeth Moran and the Eugene Moran were sent to the aid of the tow. At 12:30 the tug Williamsport left Pier H with the Assistant Boatmaster of the Pennsylvania Railroad to go to the tow's assistance. At 1 P.M. and 1:05 P.M. respectively the Isabel McAllister and the M. Moran were found to be available and were immediately dispatched to the assistance of the tow. From 2:10 on when the last tug arrived, there were ten tugs working on the tow, four with hawsers to the head tier—Delmar, Eugene F. Moran, E. F. Moran, Jr. and the Turecamo Boys; three tugs on the starboard side—the Jersey City, M. Moran, and the Cleveland; and three tugs on the port side—Canton, Isabel McAllister, and the Williamsport. This does not indicate any unreasonable delay in sending assistance to the tow. The Pennsylvania Railroad Company responded promptly to the call of the Captain of the Delmar that he needed another tug to take the place of the disabled Cleveland and presumably he was using his best judgment as to what help he needed, and when the danger threatening the tow was known by the Company additional tugs were obtained and sent to assist. Notwithstanding the assistance of these ten powerful tugs, it was impossible to keep the tow intact during the hurricane with the high seas which accompanied it, and some of the barges sank and others went ashore. This indicates that there was no lack of tugs to handle the tow and is convincing evidence of the extraordinary severity of the hurricane. The loss of the barges was, it seems to me, due to inevitable accident or "vis · major".

A number of cases have been cited by claimants and by respondents but these are all readily distinguished from the case at bar involving, as it does, quite different conditions and facts. While consideration of other cases may be helpful, each one turns upon its own peculiar facts and circumstances.

Claimants suggest that the Delmar should have tied up her tow at the Metropolitan or the O'Brien stakeboats located below the Pennsylvania stakeboat; but the Captain of the Delmar said that he had never done this and did not know whether either of them would hold his loaded tow. Moreover, at the time he might have reached them he felt that he could safely "pull out the tide" as he had done on previous occasions.

Claimants also suggested that the Delmar should have tied up her tow at the pier ends along the Staten Island shore. This seems to be fully answered by the testimony of several witnesses who said it was very congested from Pier 4 down below the Quarantine Station; also by the testimony of the Captain of the Delmar who said that he tried to get in to the piers but was unable to because there were so many ships anchored there.

The petitioners may have a decree exonerating them from liability.